UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J. C., by and through his mother and guardian ad litem, W.P, and W.P. individually<br><br>Plaintiffs,<br><br>v.<br><br>CAMBRIAN SCHOOL DISTRICT, et al.,<br><br>Defendants. | Case No. 12-cv-03513-WHO<br><br>**ORDER ON MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 38 |

Plaintiff J.C., an elementary school student with disabilities who attended Fammatre Elementary School ("Fammatre"), a charter school in the Cambrian School District ("CSD"), from 2009 to 2011, Dkt. No. 28, Second Amended Complaint ("SAC") ¶¶ 12, 15-18, by and through his mother, W.P., and W.P. individually, allege that Fammatre wrongfully denied J.C. admission for the 2011-2012 school year because of his disability under the pretext that J.C. moved to a residence outside of CSD's attendance area. J.C. and W.P. allege causes of action against Fammatre, CSD, Fammatre Principal Kristi Schweibert, and CSD Superintendent Deborah Blow (together, "Defendants") for (1) violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"); (2) retaliation in violation of the ADA; (3) violation of Section 504 the Rehabilitation Act of 1973, 29 U.S.C. § 729 (the "Rehabilitation "Act"); (4) retaliation in violation of the Rehabilitation Act; (5) intentional infliction of emotional distress; (6) negligence in violation of CAL. GOV. CODE § 815.2; (7) violation of CAL. EDUC. CODE § 47605(d); and (8) failure to discharge duty under CAL. GOV. CODE § 815.6.[1]

Defendants move for summary judgment on all of J.C.'s claims. Dkt. No. 38. For the

---

[1] The SAC does not differentiate between claims asserted solely by J.C. as opposed to his mother, and the parties do not discuss any difference in the papers filed with and in opposition to this motion. As the claims arise from Defendants' treatment of J.C., the Court will refer to plaintiffs jointly as "J.C." when discussing their claims.

reasons below, the Motion for Summary Judgment is GRANTED.

**FACTUAL BACKGROUND**

J.C. enrolled in kindergarten at Fammatre in 2009. At that time he resided at an address within Fammatre attendance boundaries. SAC ¶¶ 31-32. Sometime in 2010, J.C. moved to an address outside of Fammatre attendance boundaries, but within CSD attendance boundaries. Declaration of Deborah Blow in Support of Motion for Summary Judgment ("Blow Decl."), ¶ 21. J.C. was re-admitted to enroll in first grade at Fammatre for the 2010-2011 school year as an "intra-district transfer student." Blow Decl. ¶ 22.

J.C. has ADHD and other disabilities. SAC at ¶¶ 15-18. J.C.'s disabilities manifested in "difficult social and classroom behaviors," including "provoking behaviors in seeking attention from his peers," difficulty "getting started or using his class time wisely," "difficulty beginning a task or activity," "multiple speech sound errors," "difficulty transitioning to school in the mornings (demonstrating noncompliant or aggressive behaviors)," and "lack of awareness" of inappropriate touching. Declaration of W.P. in Support of Opposition to Motion for Summary Judgment ("W.P. Decl."), ¶ 11; SAC ¶ 27. J.C. alleges that because of his behavior, "the school's response was to . . . exclude him rather than support him." W.P. Decl. ¶ 11. For example: "at times J.C. was not allowed to go to recess in the schoolyard or had to have a 'private' recess,"[2] and "once, J.C. was left in the administrative office for an entire day as discipline." W.P. Decl. ¶ 11. On another occasion, "J.C.'s teacher made him and another special needs student turn their desks around and face the back of the room for a prolonged period, thus humiliating J.C." W.P. Decl. ¶ 8.

J.C. also alleges that W.P. was harassed by Fammatre staff when they told W.P. that J.C.'s attendance problems could require a court hearing (J.C. missed school due to numerous health issues), when they asked whether J.C. got enough sleep and whether his medications made him tired, and when the school occupational therapist told W.P. how to talk to J.C. and when to make doctor's appointments during the day. SAC ¶ 48; Bengtson Depo. Ex. G at 160:20-163:25;

---

[2] W.P. testified that J.P.'s "private recess" was recommended by his doctor as part of a modified schedule. Tollner Decl., Ex. J at 136:12-23.

Tollner Decl., Ex. J at 77:19-25.  Fammatre principal Kristi Schweibert allegedly harassed W.P. by sending her a letter regarding a confrontation between W.P. and J.C.'s teacher stating, "that if any staff feels your behavior is hostile or unsafe then they have the right to call the police." Bengtson Decl., Ex. G at 163:3-9; W.P. Decl. ¶ 8, Ex. B.

On February 15, 2011, W.P attended a "504 meeting"[3] with Schweibert and other staff members to address difficulties J.C. faced at school due to his disabilities, including "articulation, health, social-emotional skills," and academic performance.  SAC ¶ 26.  At the meeting, W.P. informed Fammatre staff that she bought a new home and anticipated moving, and she gave them the address of the home.  W.P. Decl. ¶ 6.  Afterwards, Fammatre staff members checked the address and determined that it was outside of Fammatre's attendance boundaries.  Tollner Decl., Ex. M.  One of the staff members wrote an email to Schweibert, stating,

> The address is out of our attendance area (it's SJUSD).  But before we communicate this to parent or any staff we need to draft a letter.  Then we will give it to parent noting that if she wishes student to remain at Fammatre then our procedure is to have a charter application completed, which is then reviewed by Superintendent's office regarding enrollment space.  I have checked with Dr. Blow and 1st grade enrollment is impacted so it's likely the charter application will be rejected and the student would have to enroll in district of residence immediately.  HOWEVER, we need to ensure we handle this communication together and no other staff are involved in this communication with parent.

Tollner Decl., Ex. M (emphasis in original).

On February 17, 2011, Schweibert sent W.P. a letter informing her that the new residence was outside of CSD attendance boundaries, and therefore she must submit a request for a transfer permit for J.C. to attend Fammatre as a "charter student" in the 2011-2012 school year. Declaration of Kristi Schweibert in Support of Motion for Summary Judgment ("Schweibert Decl."), Ex. D; Declaration of Eric Bengtson, Ex. G at 57:16-20.  The letter states,

---

[3] The parties use the term "504 meeting" but do not define it.  Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, requires school districts that receive federal funding to provide qualified students with disabilities "regular or special education and related aids and services designed to meet the student's individual educational needs as adequately as the needs of nondisabled students are met." *Frequently Asked Questions About Section 504 and the Education of Children with Disabilities*, U.S. DEP'T OF EDUC., http://www2.ed.gov/about/offices/list/ocr/504faq.html (last visited January 7, 2014).

3

> I am just following up regarding our conversation in [J.C.]'s 504 Section Planning Meeting on February 15, 2011. The meeting was very productive and we really appreciate your participation. You noted that at the end of this month you are moving. As Mr. Sloane informed us in the meeting there are required documentation and procedures we need to follow when a child moves and we want to give you sufficient time to do this . . . you will need to either: (a) enroll [J.C.] immediately in San Jose Unified School District . . . or (b) complete and submit to our school office a "Request for Charter Transfer Permit" (enclosed). Charter permits are then reviewed by the Superintendent's office to determine, based on enrollment numbers, if the student will be accepted as a charter to attend Fammatre or need to enroll in their District of Residence. In order to complete this process in a timely manner please provide this information to our Fammatre School Office on February 28th.

Schweibert Decl, Ex D. W.P. submitted the form on February 21, 2011. Blow Decl., Ex. E. J.C. moved to the new address in May 2011, but J.C. continued attending Fammatre for the remainder of his first grade year. SAC ¶ 34; Blow Decl. ¶ 24. The school year ended on June 11, 2012. Blow Decl. ¶ 25.

In July 2011, CSD Superintendent Deborah Blow determined that 82 Fammatre first graders intended to continue attending Fammatre for their second grade year, and that CSD received enrollment paperwork from five new enrolling students who resided within Fammatre's attendance area. Blow Decl. ¶ 31. For the 2011-2012 school year, full capacity for Fammatre's second grade class was 87 students, consisting of three classrooms with 25 students each, plus one classroom with 12 second graders and 13 third graders. Blow Decl. ¶ 27.

On July 12, 2011, CSD sent W.P. a letter informing her that it denied J.C. admission to Fammatre because the second grade class was enrolled at full capacity. Blow Decl., Ex. F. The letter states, in relevant part,

> Cambrian School District's implementation of its preference procedure is consistent with the law: The District is required to first enroll students who reside within the school and then the district attendance boundaries. Once students residing in the school and the District attendance boundaries are enrolled, the next enrollment priority is given to already enrolled charter students, followed by charter students with siblings in the school or schools of the District, and finally, new charter families.
> [J.C.] was enrolled at Fammatre School as a resident of the District and attended Kindergarten there. Just prior to or at the beginning of his first grade year, [J.C.] moved to the Bagby School attendance area, but remained at Fammatre School on an intra-district transfer. In May, 2011, [J.C.] moved into the jurisdiction of another school district, San Jose USD. He applied for admission to the second grade at Fammatre School for the 2011-2012 school year.

4

> As of the date of this letter Fammatre Elementary School is enrolled at full capacity in 2nd grade for the 2011-2012 school year and, consistent with District practice and the law, the enrolled students are current residents of the school as well as continuing charter students. There is a waiting list for second graders who have moved out of the District and have applied for admission as a charter as well as new charter applicants who have not attended Fammatre School in the previous year. [J.C.] is on this list. . . . Therefore, we recommend that [J.C.] enroll in the district of his new residence to assure his enrollment in a public program. At this time, he will not be enrolled at Fammatre School for the 2011-2012 school year for the reasons stated above.

Blow Decl., Ex. F.

Fammatre's second grade enrollment remained at 87 students for the entire 2011-2012 school year, so a spot for J.C. did not become available. Blow Decl. ¶ 37. Fammatre did not accept any charter or intra-district students for the 2011-2012 school year. Blow Decl. ¶ 34.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the court "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate specific facts showing a genuine issue for trial." Id. at 324 (quotation marks omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotations omitted). "Disputes over irrelevant or unnecessary

5

facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Id. However, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## REQUEST FOR JUDICIAL NOTICE

Defendant asks the Court to take judicial notice of three documents: (1) the Charter Petition of Fammatre School; (2) a letter dated August 6, 2004 from the California Department of Education confirming that Fammatre's charter petition was granted; and (3) the California Department of Education Charter School Database record for Fammatre. Dkt. No. 39.

Federal Rule of Evidence 201(b) authorizes a court to take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). A court may take judicial notice of "matters of public record," but may not "take judicial notice of a fact that is 'subject to reasonable dispute.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689–690 (9th Cir. 2001).

The first document, the Charter Petition of Fammatre School, is also attached as an exhibit by J.C. and is relied on in his opposition brief. The second and third documents are public documents, and the third document is available on the website of the California Department of Education. J.C. does not oppose the request for judicial notice. Therefore, the documents are either "matters of public record" or are not "subject to reasonable dispute." Accordingly, the Court GRANTS Defendants' request for judicial notice.

## DISCUSSION

Because of the multiplicity of state and federal claims asserted against institutions and individuals in this case, the legal analysis is multi-layered. First, the Order discusses Eleventh

1  Amendment immunity, which applies to knock out several of J.C.'s claims.  Second, the Court
2  addresses the heart of this case--why Fammatre's application of California Education Code section
3  47605(d) was correct and why J.C.'s argument of pretext fails.  Finally, the Order explains why
4  those findings mandate that the Court grant summary judgment.

## I. ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." California school districts, their governing boards, and school district employees sued in their official capacity are immune from suit in federal court under the Eleventh Amendment. [4] *See Corales v. Bennett*, 567 F.3d 554, 573 (9th Cir. 2009) (eleventh amendment immunity barred claims against defendant school district for federal and state law civil rights violations under 42 U.S.C. § 1983 and California's Unruh Act); *Shorter v. Los Angeles Unified Sch. Dist.*, 2013 WL 6331204 at *4 (C.D. Cal. Dec. 4, 2013) (plaintiff's claims under the ADA barred against school district and board members sued in their official capacity).  Eleventh Amendment immunity extends to state law claims brought in federal court.  *Penhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984); *Pena v. Gardner*, 976 F.2d 469, 473 (9th Cir. 1992).  *See, e.g., Zasslow v. Menlo Park City Sch. Dist.*, No. 01-0537 SC, WL 1488617 at *18 (N.D. Cal. Nov. 19, 2001) aff'd, 60 F. App'x 27 (9th Cir. 2003) (holding that Eleventh Amendment immunity barred alleged violations of California Education Code); *E.H. v. Brentwood Union Sch. Dist.*, No. 13-3243 TEH, 2013 WL 5978008 (N.D. Cal. Nov. 4, 2013) (barring causes of action for negligence and intentional infliction of emotional distress against defendant school district).  Accordingly, CSD

---

[4] Defendants did not assert directly that CSD is entitled to immunity, but the Court may dismiss the claims against it *sua sponte*.  "Eleventh Amendment sovereign immunity limits the jurisdiction of the federal courts and can be raised by a party at any time during judicial proceedings or by the court *sua sponte*." *In re Jackson*, 184 F.3d 1046, 1048 (9th Cir. 1999).  *See, e.g., Doe ex rel. Kristen D. v. Willits Unified Sch. Dist.*, C 09-03655 JSW, 2010 WL 890158 at *8 n.2 (N.D. Cal. Mar. 8, 2010) (dismissing claims against defendant Willits Unified School District *sua sponte*).  As a California school district, CSD is considered a state agency for Eleventh Amendment immunity purposes.  *Belanger v. Madera Unified School Dist.*, 963 F.2d 248, 251 (9th Cir.1992) (holding that a California school district is a state agency entitled to Eleventh Amendment immunity).

and Dr. Blow in her official capacity enjoy immunity under the Eleventh Amendment to the extent it has not been waived or abrogated, as discussed below.

Similarly, California charter schools and their officials are entitled to Eleventh Amendment immunity, and claims against defendant charter schools are dismissed on that basis. *See, e.g., Doe ex rel. Kristen D. v. Willits Unified Sch. Dist.*, No. 09-03655 JSW, 2010 WL 890158 at *4 (N.D. Cal. Mar. 8, 2010) (discussing federal and state case law, California statutes, and intent of California legislature and holding that California charter schools are considered "arms of the state" under Eleventh Amendment immunity analysis); *Sufi v. Leadership High Sch.*, No. 13-01598 EDL, 2013 WL 3339441 at *9 (N.D. Cal. July 1, 2013) (dismissing section 1983 claim against defendant charter school and remanding remaining state law claims to state court). Therefore, Fammatre is entitled to the same immunity as CSD, and Ms. Schweibert is also immune in her official capacity to the same extent as Dr. Blow.

There are exceptions to Eleventh Amendment immunity where the state has waived its immunity or Congress has exercised its power to override that immunity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65–71 (1989). For these reasons, the Ninth Circuit has held that Rehabilitation Act claims are not barred by the Eleventh Amendment. *Douglas v. California Dep't of Youth Auth.*, 271 F.3d 812, 820-21 amended, 271 F.3d 910 (9th Cir. 2001) ("we hold that by accepting federal Rehabilitation Act funds, California has waived its sovereign immunity under the Rehabilitation Act . . . the clear waiver language of the Rehabilitation Act conditions the receipt of federal funds under the Rehabilitation Act upon a state's agreement to forgo the Eleventh Amendment defense."). *See also* 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment . . . from any suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . of the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance"). Additionally, Title II of the ADA may abrogate Eleventh Amendment immunity if the conduct underlying the Title II claim also constitutes a constitutional violation. *United States v. Georgia*, 546 U.S. 151, 156 (2006).

Given that background regarding the applicability of Eleventh Amendment immunity, this

1 Order now moves to the heart of J.C.'s grievances.[5]

## II.   CALIFORNIA EDUCATION CODE SECTION 47605(d)

J.C. alleges that Defendants violated California Education Code section 47605(d) when they denied J.C. admission to Fammatre because he was an "existing pupil of the charter school." Opp. at 11-21. California Education Code section 47605(d) states in pertinent part:

> (1)   Except as provided in paragraph (2), admission to a charter school shall not be determined according to the place of residence of the pupil, or of his or her parent or legal guardian, within this state, *except that an existing public school converting partially or entirely to a charter school under this part shall adopt **and maintain** a policy giving admission preference to pupils who reside within the former attendance area of that public school.*
>
> (2)   (A) A charter school shall admit all pupils who wish to attend the school.
>
>   (B) However, if the number of pupils who wish to attend the charter school exceeds the school's capacity, attendance, except for existing pupils of the charter school, shall be determined by a public random drawing. Preference shall be extended to pupils currently attending the charter school and pupils who reside in the district except as provided for in section 47614.5. Other preferences may be permitted by the chartering authority on an individual basis and only if consistent with the law.
>
>   (C) In the event of a drawing, the chartering authority shall make reasonable efforts to accommodate the growth of the charter school and in no event shall take any action to impede the charter school from expanding enrollment to meet pupil demand.

CAL. EDUC. CODE. § 47605(d) (emphasis added). J.C.'s interpretation of the statute is wrong.

Defendants assert, and the Court holds, that section 47605(d) provides different admission policies for schools that have converted from an existing public school to a charter school ("conversion charter schools"), and a school originally founded as a charter school ("start-up

---

[5] The SAC is not clear whether defendants Schweibert and Blow are sued in their individual or official capacities. The Court gives the benefit of the doubt to J.C. and "presume[s] that officials necessarily are sued in their personal capacities where those officials are named in a complaint, even if the complaint does not explicitly mention the capacity in which they are sued." *Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir. 1999). *See also Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1285 (9th Cir. 1994) ("where the plaintiff fails to specify in the body of the complaint the capacity in which suit is brought against the defendants, we hold that what is, and is not, expressly stated in the caption controls.").

charter schools"). Section 47605(d)(1) governs admissions for conversion charter schools, and gives preference to "pupils who reside within the former attendance area of that public school," whereas section 47605(d)(2) governs admissions for start-up charter schools, and gives preference to "existing pupils." Section 47605(d)(1) is applicable to Fammatre as a conversion charter school and requires it to give admission preference to pupils who reside within the attendance area of the school. Section 47605(d)(2)'s language regarding "existing pupils" is inapplicable to schools like Fammatre that have converted from a public school to a charter school. *Id*. Accordingly, it was appropriate for Fammatre to give admission priority to second grade students who resided within Fammatre's attendance area.

This interpretation of section 47605(d) finds support in *California School Boards Association v. State Board of Education*, where the California Court of Appeal found that the California Education Code distinguishes between conversion charter schools and start-up charter schools. 191 Cal. App. 4th 530, 569 (2010). The court described several ways in which conversion charter schools are treated differently than start-up charter schools in the funding made available to them, the requirements for their creation, and their rights to use school facilities. *Id*. at 569 - 574. The court specifically examined California Education Code section 47605(d), and stated:

> An additional difference between start-up and conversion charter schools has been recognized by the Legislature in the area of student attendance. Generally, charter schools must admit all students who wish to attend to the extent the schools have the capacity to do so. The Legislature has provided that admission to a start-up charter may not be determined according to the place of residence of a student, parent or legal guardian. *However, a different rule applies to conversion charter schools.* A conversion charter school is statutorily required to "adopt and maintain a policy giving admission preference to pupils who reside within the former attendance area of that public school." (Ibid.) *A conversion charter school's student population is thereby forever tied to the community from which it was originally based.*

*Id*. at 573 (citing CAL. EDUC. CODE § 47605(d)) (emphasis added).

The view expressed in *California School Boards Association* is persuasive and there is no reason to find that the California Supreme Court would decide otherwise. *See In re K F Dairies, Inc. & Affiliates*, 224 F.3d 922, 924 (9th Cir. 2000) ("A state appellate court's announcement of a

10

rule of law is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.") (citation omitted). Fammatre converted from a public school to a charter school in 2004. *See* Defendants' Request for Judicial Notice, Exs. A, B. It is recognized by the California Department of Education as a conversion charter school. *See* Defendants' Request for Judicial Notice, Ex. C (Charter School Database record for Fammatre stating "Conversion" next to the words "Charter Type"). A plain reading of section 47605(d), explained in the discussion in *California School Boards Association*, requires Fammatre to give admission priority to students who reside within its attendance area after it has converted to a charter school, not merely while it was in the process of converting, as J.C. contends. *See* Opp. at 15.

J.C. argues that the words "existing pupils" in section 47605(d)(2) should be read in conjunction with the requirements of section 47605(d)(1). Opp. at 15 ("[t]he law provides that both are preferences: pupils attending the charter and pupils who reside in the district"). J.C. does not cite any authority for this proposition other than the statute itself. Because the words "existing pupils" in section 47605(d)(2) do not appear in section 47605(d)(1), the Court will not infer that the legislature intended that conversion charter schools also give preference to "existing pupils." Such an interpretation would render meaningless the explicit exception carved out for conversion charter schools in section 47605(d)(1). *See Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous").

J.C. next argues that Defendants violated CSD admissions policies. However, the record indicates that CSD admission policies give priority to students in its attendance area over existing pupils. *See* Tollner Decl., Ex E (document titled "Cambrian School District Charter Student Enrollment Information for Parents" stating that the school district is required to first enroll students that reside within school attendance boundaries, and *"[o]nce students residing (living) within school attendance boundaries are enrolled, next enrollment priority will be given to already enrolled charter students*, followed by charter students with siblings in our schools, then

11

new charter families.") (emphasis added).

In light of the above, the Court finds that J.C. has failed to raise a genuine issue of material fact that Defendants violated California Education Code section 47605(d) or CSD policies when it gave priority admission to second grade students living within its attendance boundaries.

## III. DISABILITY DISCRIMINATION AND RETALIATION UNDER THE ADA AND REHABILITATION ACT

Regardless of whether his interpretation of Section 47605(d) is correct, J.C. claims that he was denied admission at Fammatre in violation of the ADA and section 504 of the Rehabilitation Act. Title II of the ADA provides, in relevant part, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act provides, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.[6]

To make out a prima facie case under either the ADA or Rehabilitation Act, J.C. must show that (1) he is disabled under the Act; (2) he is "otherwise qualified" to enroll at Fammatre, i.e., he can meet the essential eligibility requirements of the school, with or without reasonable accommodation; (3) he was dismissed solely because of his disability; and (4) Defendants receive federal financial assistance (for the Rehabilitation Act claim), or is a public entity (for the ADA claim). *See Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045-46 (9th Cir. 1999)

---

[6] J.C. cannot allege viable ADA and Rehabilitation Act claims against defendants Schweibert and Blow because they, in their individual capacities, neither "receive federal financial assistance" nor are "public entities." The ADA and Rehabilitation Act do not allow for suits against individual defendants, even for retaliation claims. *See, e.g.*, *Stassart v. Lakeside Joint Sch. Dist.*, No. 09-1131 JF, 2009 WL 3188244 (N.D. Cal. Sept. 29, 2009 ("A careful reading of the relevant provisions in light of the ADA's overall structure makes it clear that plaintiff cannot maintain an ADA retaliation claim against individual defendants who do not otherwise satisfy the definition of an employer. By analogy, school officials may not be held liable either.") (citation omitted); *Hodge v. Oakland Unified Sch. Dist.*, No. 09-04719 RS, 2010 WL 2721528 (N.D. Cal. July 7, 2010) ("no cause of action exists under the Rehabilitation Act against employees in their personal capacities.").

(stating prima facie elements for ADA and Rehabilitation Act cases).

The Defendants do not dispute that J.C. is disabled and that Fammatre receives federal financial assistance. The issue is whether J.C. was "otherwise qualified" to enroll at Fammatre. The implementing regulations of the Rehabilitation Act define an "otherwise qualified" individual as one who "meets the academic and technical standards requisite to admission or participation in the [school's] education program or activity." 34 C.F.R. § 104.3(k)(3). Defendants argue that J.C. was not qualified to enroll at Fammatre because (a) he resided outside of Fammatre and CSD attendance boundaries; and (2) the second grade enrollment at Fammatre was at capacity with students who resided within the attendance boundaries. Mtn. at 19-20. J.C asserts that these reasons were just a pretext to deny him admission because of his disability. Opp. at 21-24.

J.C. asserts in essence that he was a challenging student for Fammatre, that the Defendants had personal animus against W.P. because of her "verbal advocacy" on J.C.'s behalf, and that this "bad blood" motivated their decision to deny J.C. admission. Opp. at 22-23. J.C. further asserts that Fammatre "could have made room for him" in its second grade class because Fammatre was not required to "cap" the 2011-2012 second grade class at 87 students, and it could have moved students from the mixed second and third grade class to accommodate him. Opp. at 17-18, 23. In support, J.C. cites evidence that the class sizes at Fammatre vary from year to year. Tollner Decl., Exs. F, G, H.

J.C. provides no evidence suggesting a connection between Fammatre's 2011-2012 enrollment capacity and its decision to deny his admission. There is no evidence that other charter transfer students were admitted to Fammatre despite class size limits. On the contrary, Fammatre did not accept any charter or intra-district students for the 2011-2012 school year. Blow Decl. ¶ 34. CSD superintendent Deborah Blow testified that 2011-2012 admissions were based solely on enrollment numbers, and that criteria such as attendance, behavior, and parent cooperation were not considered. Bengtson Decl., Ex. 1 at 115:1-116:4; 118:17-119:9. Without more, there is insufficient evidence that CSD developed its 2011-2012 school year class size limits to preclude his attendance. While there is an inference that could be drawn that Defendants had a difficult relationship with W.P., there is no evidence that this or any other factor regarding J.C.'s conduct

1 or needs, rather than the legitimate reasons noted above, motivated CSD's decisions on 2011-2012
2 class size numbers or J.C.'s admissions application.

3 Accordingly, J.C. cannot establish a prima facie case of disability discrimination under the
4 Rehabilitation Act or the ADA. He cannot show that he was "otherwise qualified" to enroll at
5 Fammatre or that he was dismissed solely because of his disability since Defendants appropriately
6 applied their policies and the California Education Code in light of his out of district status.

7 Further, there is no obvious constitutional violation alleged in the SAC, and the lack of
8 evidence to establish pretext makes plain that none occurred in this case. Where there is no
9 constitutional violation, there is no basis to abrogate Eleventh Amendment immunity. *See, e.g.,*
10 *Morris v. State Bar of Calif.*, No. 07-2890 PJH, 2008 WL 4067448 at *5 (N.D. Cal. Aug. 22,
11 2008) (applying *United States v. Georgia* and stating that a plaintiff must "allege conduct that
12 violates the Fourteenth Amendment, if his ADA claims . . . are to fall outside the boundaries of
13 Eleventh Amendment immunity"); *E.H. v. Brentwood Union Sch. Dist.*, No. 13-3243 TEH, 2013
14 WL 5978008 at *5 (N.D. Cal. Nov. 4, 2013) (ADA claims barred by Eleventh Amendment
15 immunity where plaintiff failed to allege constitutional violation by defendant school district).

## IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In order to establish intentional infliction of emotional distress, J.C. must show outrageous conduct by Defendants. *Heller v. Pillsbury Madison & Sutro*, 50 Cal. App. 4th 1367, 1388 (1996). To be outrageous, the conduct must be so extreme as to "exceed all bounds of that usually tolerated in a civilized society." *King v. AC & R Adver.*, 65 F.3d 764, 770 (9th Cir. 1995) (internal quotation marks omitted and citation). "Summary judgment is proper if a claim cannot reasonably be regarded as so extreme and outrageous as to permit recovery." *Id*. (internal quotation marks and citations omitted).

J.C. claims that he suffered emotional distress because Defendants "prevented J.C. from continuing his education at Fammatre by fomenting a lie, namely, that J.C. could not return to Fammatre because he had moved out of the District . . . ." SAC ¶ 111. There was no lie and this conduct is not sufficiently "outrageous" under California law to support a claim of intentional infliction of emotional distress. *See Colombini v. Members of Bd. of Directors of Empire Coll.*

*Sch. of Law*, No. 97-04500 CRB, 2001 WL 1006785 (N.D. Cal. Aug. 17, 2001) *aff'd sub nom. Colombini v. Members of Bd. of Directors*, 61 F. App'x 387 (9th Cir. 2003) (no claim for intentional infliction of emotional distress where school denied disabled student's requested accommodations for exam taking and student subsequently disenrolled from school); *C.B. v. Sonora Sch. Dist.*, 691 F. Supp. 2d 1123, 1157 (E.D. Cal. 2009) (no claim for intentional infliction of emotional distress where police handcuffed disabled child "as a means of controlling the child's involuntary manifestations of their disability"); *Cf. Banks ex rel. Banks v. Modesto City Sch. Dist.*, Case No. No. 04-6284 REC, 2005 WL 2233213 at *12 (E.D. Cal. Sept. 9, 2005) (facts supported claim for intentional infliction of emotional distress where defendant taunted disabled child about a traumatic incident, used pepper spray on the child, and threatened child with its repeated use).

## CONCLUSION

For the reasons above, Defendants' Motion for Summary Judgment is GRANTED. Eleventh Amendment immunity applies to all of J.C.'s causes of action against CSD and Fammatre, and the individuals in their official capacities, except the Third and Fourth Causes of Action under Section 504 of the Rehabilitation Act. There is no disputed material fact with respect to any of the causes of action, and for the reasons stated above the defendants are entitled to judgment as a matter of law.

**IT IS SO ORDERED**.

Dated: January 21, 2014

WILLIAM H. ORRICK
United States District Judge